Good morning, John Ballas. On behalf of Charles Green, I intend to save about two of my ten minutes for rebuttal. This is an unusual pre-AEDPA case, so the standards of review are different than what we're used to in the last number of years. Each of the issues on appeal are the legal conclusions are reviewed de novo, and the factual findings are reviewed for clear error. I'd like to focus my argument on the involuntariness. We do owe deference, though, to the state court findings, right? To the factual findings, yes. But in this case, the court made very limited factual findings and just basically reached its ultimate conclusion. I want to focus on the involuntariness of the Miranda waiver and the involuntariness of the confession. The trial court, after hearing a lengthy hearing on the voluntariness of the confession, determined that this was a close case, and he found it to be very difficult. So I think that reasonable minds can differ into the ultimate conclusion. Ultimately, the test is whether the defendant's confession is a product of a rational intellect and free will. And you look at both the coercive police activity as well as the circumstances of the defendant and his conditions and circumstances. In this case, we have both. We have both coercive police activity as well as unusual circumstances of the defendant that made him particularly susceptible to police coercion. We had the testimony of a psychologist for the defense, Dr. Stein, that the trial court found credible, though he ultimately disagreed with his conclusion, that the conclusion of the confession was involuntary. But Dr. Stein testified that Mr. Green had a low IQ in the low 80s or high 70s and had a personality disorder that made him particularly susceptible to coercive police activity and prolonged interrogation. When you look at the police activity here, he was, before he confessed, he was involved in extremely coercive circumstances. He was being detained at a police station for over five hours. The first argument in my brief on whether or not he was in custody from the time he first was placed at the police station, brought to the police station, is an independent argument, but it also bears on the voluntariness of the confession. The California Supreme Court, when they reviewed the case initially, determined that he was in custody unlawfully, at least at the time after the initial interrogation of the first couple hours when he was left alone in the locked room. So depending on how you look at it, he was in custody and detained for at least three hours before the officers returned around 10 o'clock or, in my view, over five hours. How many different segments do you break that up into? I mean, basically you've got a point in time where Miranda warnings are given, so something has changed at that point. Is all the time prior to that the same or do you categorize that differently? Well, I think it is, I think it's the same in terms of the coercedness of the police activity. The fact that he is locked in a room for a number of hours all bears on the psychological pressure and the coercion of the police. So you go back to the very beginning. Yes. When he first, when he comes to the police station, and I take it there's not a dispute that he went to the police station voluntarily, but you start at the time that they go into the witness room, interrogation room, whatever it's called, and the door is locked and he stays there for the next several hours. From the beginning of that, you think you identified as custodial? I think from the time he gets to the police station, in my view, from which is he left to go to the police station about 4.35, it was only a couple minutes away, and he was interviewed there until about 6.30, that that entire period was custodial. Now, at what point does he give testimony that turns out to be damaging? Well, he gave the most damaging confession after midnight, 12.55 a.m. What I'm getting to here, just to cut to the quick, is that the most damaging testimony or statement does come later after the Miranda warnings have been given. I understand there are arguments with regard to that based on what happened before, but I'm trying to identify was there anything that he said prior to, during the first two or three hours before the police officers left to conduct their independent investigation that turns out to be significant? Well, he denied guilt and denied any involvement in the killing of Mr. Golden, but he did say some things. They asked him in terms of what time he left the parking garage, which he's told him was at 7.50 p.m. They asked him about his financial situation, how many hours, how much money he made per hour, how much he was paying for rent, basically information, evidence that got out that he was on low in cash that provided a motive for the robbery. And this was introduced in the People's Case-in-Chief before Mr. Green testified later. So it was certainly, I concede, the most damaging stuff was later on when he confessed, but he did give some incriminating information right from the start. The question you're going to have to deal with, let's assume for the moment, and I'm not sure where I come out on this, assume for the moment that I agree with the proposition that from the beginning of the questioning at the police station, it was custodial and qualifies as custodial interrogation, so that before the Miranda warnings are given, there's a problem with it. Is there harm that resulted? I mean, is there breck prejudice? Why is it that this should cause us to grant the petition? Because the most damaging testimony did come, or statement did come, after the Miranda warnings were given. Well, I agree that that's certainly true. I think there were a few damaging things that came off initially. And then significantly is the question on whether that custody, what bearing it has on the voluntariness of the confession, or if his detention and his custody initially was deliberate and was intentional, how that bears on the voluntariness of the confession. So the argument appears based not so much on the need to suppress specific statements that were given before the Miranda warnings were given, but, as you say, whether it undermines the conclusion that the confession was voluntary. Well, when he confessed later, he did say a number of the same things that he said in the initial statement in terms of that he needed cash. There were some reasons. The first statement did corroborate some of the – I guess it reaffirmed some of the damaging statements he made later. And when he's testifying at trial, again, I think that the fact it was used in the case in chief and they provided the two confessions I think it was damaging. But I – but it's also true that he confessed at 12.55 p.m., and that was the most damaging confession. There's no way around that. That's the most damaging. I'm sorry. When were the Miranda warnings given? I'm sorry? That was 12.55. Right. And in the timeline, when were the Miranda warnings given? It was a little bit after 10 o'clock. So there was a considerable amount of time. Yes. The officers returned about 10 o'clock. They gave Miranda warnings, I believe, about 10.15. And then for the next hour, hour and a half, two hours, he had discussion with them, and he talked to them, but he didn't confess. And he wanted to find out what they knew. They, at that point, told him that they knew that he had – they told him that he had blood on his coveralls. They had a lot of incriminating information. They believed he had lied initially. They went through a lot of the evidence, which goes to the coarseness of the police activity. Other than the initial time in the beginning, when he was first – when he was first asked to go to the police station, once he was at the police station later and he was He didn't know he was locked in the room, did he? Well, he testified he did because he testified at the voluntariness hearing that he asked specifically the officer to use the bathroom, and the officer said he had to wait until the other officers returned. So I believe he did know that the room was locked, and the officers testified that he needed a key to enter the room. So that's the officer's But he didn't know they needed a key, did he? He didn't testify about that. I think you can make an inference that when they came in, if they needed a key to open the door, that he would have seen that and he would have known the door was locked. This – the record is But the fact that you need to enter a room using a key doesn't mean that you need a to leave it. A lot of times keys only work on the outside. I think his testimony that he asked to use the bathroom and they told him that he had to wait for the other officers to return, as well as Lieutenant Green's testimony that he would not have allowed him to leave for the bathroom without checking with the other officers is also additional evidence that he knew the room was locked. I think if he's just waiting – I think it's probably natural if you were going to be in a room for five hours that maybe he would check the door, as well. And there were – there were – besides the – besides those information, I think that the fact that – that the other course of activity is the psychological questioning used by the officers, both giving him incriminating information, telling him that they knew he lied, and then at the same time then telling him that we're his friend, that we would kind of go and play him back and forth, both bad cop and good cop, is also coercive. And the fact that, as Judge Kaczynski pointed out, that he did not confess for the first couple hours after the Miranda warning was given and he agreed to talk to them is – is also significant reason to believe of the coerciveness of the activity. Even when he did ultimately agree to talk with them and he – they explained the Miranda warnings and he said he would agree to talk, the first question to him was about what happened with the death of Mr. Golden. And he said then, give me a time to think for a second. I think that's an independent claim, but it also goes to the coerciveness of the police activity here. I'm going to save my remaining time for a bubble. Good morning. May it please the Court. Juliet Haley appearing for the appellee Gomez. A couple of things to start. First, counsel's correct that this case was tried back in 1985, so a lot has changed. It does – it does not get the ADPA deference. However, I – it does – the implied factual findings as well as explicit factual findings by the State court are entitled to a presumption of correctness. And that's significant just in terms of the testimony, what was credited and not credited by the trial court. I think you do need to look at the whole thing in context, which is that Green, first of all, was giving the story initially – the initial story he gave to the police was the story he was giving his boss. And the police asked him, came to his place of work, said, would he mind coming down, they'd give him a ride, they'd bring him back. He said, sure. He went down to the police station. They talked for about 55 minutes. Then he agreed to give a statement. They gave another statement for 30 minutes. They said to him, we have to go meet this other – these other investigators. Will you – we have another appointment. Are you willing to stay here while we do that? That, to me, indicates that he was told he had an option. He said, no, he would wait. He was being a cooperative witness, a significant witness, because he is probably the last person that saw him – excuse me, the victim alive. The police returned. Sometimes commands are – are phrased politely as questions. I frequently ask my law clerk if he'll go get something for me. I doubt if they think they have a serious option. It's being – being confined into a room that's 7 by 10 for what amounts to several hours. At one point, asking to go to the bathroom, and at least by his testimony, being told no. Isn't there some point where that crosses a line to custodial, where an objective observer would say, you know, I'm not free to get up and walk out? Well, I think the – I mean, I agree that obviously there's a line that gets crossed at some point. First, Mr. Green's testimony was not credited. I mean, he gave a version of events that was close. The analogy is such that if somebody was in the room for a long time, it's not unlikely that that person would – would desire to go use the bathroom. And if he couldn't get out of the room himself and would have to ask somebody, nobody testified that he was allowed to go, so – so I have to suspect that he probably did sit in that room for several hours without leaving. No, I mean, I think that – I agree that sitting in a room – I mean, just one other thing to appreciate. The evidence in the record is that this is the same witness room that the victim's family was interviewed in. I mean, this is not like they put him off to Gulag to interview him. This is their standard – their standard procedure. So – and it also, I think, is important to – Kennedy, for five hours? Well, I think what happened and what the record really clearly demonstrated and every trial judge to look at at FactFinder found this to be the case was that, you know, when you read the testimony of the homicide investigator, this was the beginning, the nascent stages of the investigation. And he was running around trying to pull witnesses together, trying to talk to this person. They have a simultaneous people showing up to try to do – to look at the crime scene. They're doing lights, trying to figure out if there's blood. There's a lot going on. And so – Yes, but from his standpoint, he was in there for five hours. He couldn't even go to the bathroom. Well, I don't know if that's true. We don't have affirmative evidence on the record that was credited that he asked to go to the bathroom and was denied. What we know is that he came down as this witness giving a story, trying to be helpful, very animated, the same story he had given to his boss. And he was being this cooperative witness and was talking with the police, trying to be helpful, trying to tell them, you know, all the details, everything that he knew. He was told, we've got to go to this other appointment. Do you mind waiting? And I appreciate that saying no to a police officer under any circumstance ever is what it is. But he was given that option, which is different than being under arrest or being, you know, I mean, it is different. They return. It was, you know, it was not a design. Things went long. As soon as they come back, they're very straight up with him and said, we have now come into other evidence. There's other statements. We don't believe your first statement. Mirandize him. They mirandized him. He signed a written waiver. He wanted to talk about some of the evidence in the case. They talked with him for about an hour. He asked to have a Coke. They gave him a Coke. He said he wanted to talk to his mother. He talked to his mother for 30 minutes. Then he came back and said, I'm going to talk to you. He gives a statement, not a written statement, not a recorded statement, but gives them the details. Then he starts a recorded statement, just like he did earlier. And at that point, he said, you know, I need a minute to think. And they said, come on, it's the time. They've been talking about it. He's already confessed. And then he puts it, he has it tape recorded. I just think you look at the whole picture, it's not a coerced. You mentioned that he was not under arrest. That's not the test. The test is whether he was free to leave. No, but what I'm saying is that whether he was under a circumstance in terms of Miranda being necessary prior to that time. Yeah, but you don't have to be under arrest to, it's just whether you're free to leave. Right. What I'm saying is that I think that the kind of circumstance where you believe you're not free to leave, where you are under the authority of the police, wasn't present here. I mean, if I'm, you know, the police are saying, do you mind waiting? I mean, I appreciate that internally, I may feel like, oh, I better cooperate, but that's very different than the case law in terms of what the estimation is. I'm just wondering if they say, do you mind waiting here in the open area in the police station where people come and go, and I say, hey, don't go, you know, do you mind hanging around, it's a different thing to say, you know, do you mind waiting, and then lock the door and leave the guy locked in. I mean, it just feels different, seems different. No, I appreciate that. I mean, and the other thing that I need to just, like, pull back on the bigger picture, you've asked a lot about what kinds of statements that he made prior to being Mirandized and prior to, you know, signing a written waiver and prior to talking to his mother. Basically nothing inculpatory. I mean, he was giving the same story to his boss. They could have had, you know, that story, that testimony from his boss, pretty much, but it didn't do anything. I mean, counsel made a big mark that it came in on the prosecutor's case in chief. But they had nailed down his version of events prior to, you know, so they had nailed him down as to that, which narrowed what he could say afterwards. Well, what's interesting is that, I mean, what I was struck by is that, you know, this was tried originally as a death penalty case, and the jury came back with LWOP. But, you know, when he gets to trial to testify, he actually testifies almost to the whole thing, I mean, in the sense of being on the hook for the murder. I mean, he said that his mental intent, you know, was not to kill him, but, I mean, he purportedly, these two guys that he never identifies and gives names to who wanted money from him, I mean, he sets the victim up, he, you know, takes the victim down. They come and start hitting the victim. He goes and gets the victim's car, drags the body, helps them, cleans up the blood. I mean, he's a major player in this thing, even under his, like, now fourth version of events. My point is simply that, you know, apart from the true confession, and never mind the physical evidence, you know, that his coveralls are found saturated with blood. Can you speak to the application of Mazur v. Seabird? Seabird is, my understanding of Seabird is the principle that if there is an intentional two-step process for interrogation where the police first elicit a confession from the defendant without Miranda, and then come back, Mirandize him, and take it again, that that's a problem. There was no confession in any part of the Mirandize, un-Mirandize statements. And there's clearly no evidence that this was some sort of intentional two-step process. Has there even been an allegation that there was intentional conduct by the police in the first half? I don't believe so. I didn't see anything. No. No. I mean, it's more, you know, no, not that I'm aware of. So I just think at the end of the day that there's, I don't think there were any of the violations that are alleged, and I don't think any of it was prejudicial. And if there are no further questions, I would submit it. Thank you. Thank you. I just have a couple points I want to make. First, the Attorney General made a big deal about the judge's implied factual findings. I don't think there were any such implied factual findings, especially with the testimony of Mr. Green himself. If you look at it, this was a very lengthy hearing, and they had about 50 pages of transcripts on the argument and the judge's ruling. When the judge, after all the evidence was out, the judge starts off by saying, this is a very close case. It's difficult. And I don't think either one of you could say anything different. The whole argument and his rulings are in the excerpt of the record at 223 to 273. He never said anything about Mr. Green being not credible. And I think the record is, would just as reasonably or more reasonably support his testimony would be that he found credible than otherwise, as the Attorney General has mentioned. The second thing, I guess I have three points, is that What do you do with the fact that, over the argument opposing counsel, that really he didn't say very much incriminatory until after he got the warnings? Well, I think that's largely true because he, somewhat true because he denied involvement in the killing initially. But he did give a number of incriminating points, placing him at the parking garage, that he was short of cash, putting him there at 750, which conflicted with other testimony. Are you making a Siebert claim? I think because the Siebert and all the evidence came, the Siebert came after this whole entire hearing, that it may, I did raise it in my brief, and it may be appropriate to remand for further findings on that. But at the time of the hearing, that was not really an issue. And I just want to just So has your client preserved the Siebert claim? Was it presented to the State courts? Was it presented to the It was not presented to the State court. It was So we really don't have authority to consider it, right? Unless you view Siebert as sort of a derivative of It's derivative of the custodial interrogation initially. And I just We can't say that the, the key inquiry there would be whether it was deliberate two-stage process, whether the police engaged in this sort of two-step process of getting stuff out of him and then coming back and giving him the warnings. That is a factual issue. And we can't say that the State courts had a fair shot at resolving that factual issue. I think that's true. Yeah. I mean, it was never raised in the State court. Does that mean it's, it's, it's gone here? I don't think it is because I think the argument was that he was unlawfully detained in custody without giving his Miranda warnings initially, and that all evidence obtained after that should be suppressed as a fruit of the unlawful arrest. And I think that Siebert changes the law as a result of, kind of, kind of defeats a lot of that argument. But, but I think that for that reason, though, he should still be able to use the Siebert analysis. You mentioned an unlawful arrest. Is there evidence that the arrest, that there was an arrest? Well, I guess I use the term arrest or detention. The California Supreme Court said he was unlawfully detained at the time the officers, after their initial interrogation. But the issue is the detention, not arrest. Right. Okay, thank you. Yeah. Thank you. Time is up. Okay, so sorry, you were sentenced a minute.
judges: Kozinski, Hug, Clifton